IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASCADES BRANDING INNOVATION,
LLC,

                    Plaintiff,

          v.

WALGREEN CO., BEST BUY CO.,
INC., EXXON MOBIL CORP.,
TARGET CORP., and LIMITED
BRANDS, INC.,

                    Defendants.

Case No. 11 C 2519

Hon. Harry D. Leinenweber

<u>MEMORANDUM OPINION AND ORDER</u>
(REDACTED)

Before the Court are Defendant Best Buy Co. Inc.'s ("Best Buy") Motion to Dismiss, Defendant Target Corp.'s ("Target") Partial Motion to Dismiss and Plaintiff's Motion to Disqualify Defendant Best Buy's counsel, Robins, Kaplan, Miller & Ciresi ("Robins Kaplan"). For the reasons stated herein, Defendants' Motions are denied and Plaintiff's motion is granted.

I. <u>BACKGROUND</u>

Plaintiff Cascades Branding Innovation, LLC ("Cascades Branding") is wholly owned by Cascades Ventures, LLC ("Cascades Ventures"). Cascades Ventures, in turn, is wholly owned by Anthony O. Brown ("Brown"). Brown is also the President and Co-Founder of Cascades Branding. As Brown sees it, he and Cascades Ventures were put on this earth to assist inventors and their companies in

"overcome[ing] obstacles to effective patent licensing," helping David-like small inventors slay Goliath "giant enterprises" who infringe their patents. Dkt. 54-1, 1. Other people call Brown the "original patent troll." Dkt. 64-1, Page ID 371.

Cascades Branding, an Illinois limited liability company, is the exclusive licensee of the patent in suit, U.S. Patent No. 7,768,395 ("the '395 Patent"). The patent relates to improvements in mobile devices, allowing devices to locate branded products and services in their vicinity. Best Buy and Target each have a mobile device application ("app") that allows mobile devices to locate nearby stores without the user having to enter location information. Plaintiff claims this infringes on the '395 patent and that the apps have no substantial non-infringing use. Plaintiff accuses both Defendants of inducing infringement and contributory infringement by making their apps available for customers (among others) to download and use.

Defendants Best Buy and Target are each incorporated in Minnesota and have their principal places of business there also. Best Buy is represented by Robins Kaplan. Specifically, Emmett J. McMahon ("McMahon") of Robins Kaplan has appeared *pro hac vice* on Best Buy's behalf.

Brown, as owner of Cascades Ventures, approached Robins Kaplan partner Ronald J. Schutz ("Schutz") in the summer of 2010 as owner of Cascades Ventures, seeking representation for Cascades Ventures

- 2 -

(or a to-be-formed affiliate) in the licensing and enforcement of a patent portfolio (the "Elbrus Portfolio") unrelated to the patent in suit.  The two exchanged a series of e-mails which have been submitted to the Court by agreement of both Plaintiff and Robins Kaplan.  Schutz declined to represent Cascades, and informally notified him of this in an August 27, 2010 e-mail.  More formally, Schutz definitively closed the file on May 20, 2011 and communicated this in an e-mail of the same date.

The parties agree no attorney-client relationship was formed, but dispute whether Schutz learned confidential information during that exchange that could help Best Buy in the current litigation.

Several years ago, Schutz and McMahon represented a company called TechSearch, LLC, which Brown co-founded and headed as President until he sold it lock, stock and barrel in 2005.  As part of that representation, Schutz, McMahon and other Robins Kaplan attorneys helped litigate two lawsuits related to a patent portfolio (the "Chan Portfolio") unrelated to the patent at issue in this lawsuit or the patents that were the issue of the 2010 negotiations.  As part of the representation, Robins Kaplan represented TechSearch in reaching settlement or licensing agreements with at least eight companies.  That relationship lasted from approximately 2002 to 2004.

Cascades contends that, through the two interactions, Robins Kaplan has gained privileged information relating to Brown's (and

- 3 -

thus Cascades Branding's) litigation strategy, business model, and approach to negotiating settlements, licenses and reasonable royalties. Dkt. 54-1, 3.

Events in this litigation began percolating on April 14, 2011, when attorneys for Cascades Branding notified Best Buy it was infringing on the patent (the same day they filed suit).

## II. Motions to Dismiss

### A. Legal Standard

On a motion to dismiss, all of a plaintiff's allegations are treated as true. FED. R. CIV. P. 12(b)(6); *Wigod v. Wells Fargo Bank, N.A.*, No. 11-1423, 2012 U.S. App. LEXIS 4714, at *2 (7th Cir. March 7, 2012). Complaints will survive a motion to dismiss if they contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). However, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1940.

### B. Analysis

#### 1. Direct Infringement

Target does not dispute the sufficiency of the direct infringement charge, but Best Buy does, claiming Plaintiff's complaint is conclusory and does not meet the standards of *Iqbal* and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Plaintiff responds that neither of those cases invalidated Form 18 of the

Rules of Civil Procedure (a sample form for patent infringement complaints) and that its complaint is at least as sufficient as that boilerplate. It points to *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354 (Fed. Cir. 2007), a post-*Twombly* but pre-*Iqbal* case that allowed a bare-bones *pro se* infringement complaint to proceed. Best Buy says *Colida v. Nokia, Inc.*, 347 Fed.Appx. 568, 571 n.2 (Fed. Cir. Oct. 6, 2009), casts doubt on *McZeal's* efficacy in light of *Iqbal*.

This Court believes that the Federal Circuit knows how to overrule itself, and a passing footnote reference in a *design* patent case, where the Plaintiff did not even contend it met Form 18 standards, does not overrule *McZeal*. While it is true *McZeal* was a *pro se* case, and made reference to additional latitude for such litigants, it did not stand for the proposition that such litigants could fall below the minimum required and the case merely outlined that floor, which has been met here. Plaintiff notes in the Complaint that Defendants have infringed the '395 patent through "making, using (for example by testing), offering to sell and/or selling" the app. This equates with Form 18. Even if it did not, the specific example of "testing" is non-conclusory language not included in the statutory language or Form 18 that brings the Complaint above that level. The Motion to Dismiss the direct infringement allegation is denied.

### *2. Indirect Infringement*

A question requiring more examination is whether Plaintiff's allegations in regard to inducement of infringement and contributory infringement meet pleading standards.

The Court agrees with the numerous cases cited by Defendants that hold that Form 18 does not apply to indirect infringement. *See, e.g., Elan Microelecs. Corp. v. Apple, Inc.*, No. C 09-01531 RS, 2009 WL 2972374, at *2 (N.D. Cal. Sept. 14, 2009) ("[i]n the absence of any other form that addresses indirect infringement and is made binding on the courts through Rule 84, the Court must apply the teachings of *Twombly* and *Iqbal*.")

Indirect infringement requires that the party inducing or contributing to infringement know of the patent (or be willfully blind to the existence of such a patent) and that the product or activity at issue infringes. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009) (hereinafter *Lucent*). Defendants say Plaintiff has failed to plead this level of scienter.

The Court disagrees. Plaintiff's Complaint specifically alleged that it sent both Defendants, on April 14, 2011, a "Notice of Infringement [that] included an infringement claim chart for the Cascades Patent." Defendants fault Plaintiff for trying to attach said notices of infringement in its response, but the Court did not consider these, because the necessary information appears in the

Complaint itself. It is arguably sufficient to merely note that a notice of infringement was sent to a defendant, because implicit in this is the inference that such notice (1) notified a defendant of the existence of the patent in suit and (2) informed them of the infringement.

Additionally, Plaintiff's Complaint went even further and noted that the notice "included an infringement claim chart for the Cascades Patent, and a firm license offer to abate Best Buy's [and Target's] infringement." This makes those inferences explicit, and, particularly when coupled with the allegation that the apps are incapable of any non-infringing use, meets the scienter requirement.

The next objection is that indirect infringement requires a primary instance of infringement by a third party (*See, e.g., DSU Med. Corp. v. JMS Co. Ltd.*, 471 F.3d 1293, 1303 (Fed. Cir. 2006)) and that Plaintiff failed to sufficiently allege this. Defendants argue that a specific third party must be identified.

Again, the Court disagrees. Plaintiff noted that Defendants "provide[] its customers the Target [and Best Buy] application" and the app "operates on consumers' smart phones." As Plaintiff points out, exact specificity of the third party is not required at the trial level, let alone at the pleading stage. In *Lucent*, the Federal Circuit allowed a jury verdict finding inducement of infringement and contributory infringement to stand where no single

third party infringer had been identified. *Lucent*, 580 F.3d at 1317-1320. Instead, it was sufficient for the jury to infer from circumstantial evidence that at least one person had done so. *Id.* at 1318. The Court notes that case involved a product that was capable of being used in a non-infringing manner, and so the inference that someone used it in an infringing manner is an even greater leap than what is alleged here, that no non-infringing use is possible.

Plaintiff has alleged Defendants' customers have downloaded the app and that they have "operate[d]" them on their phones. That suffices.

### C. Conclusion

For the above reasons, the Court finds Plaintiff has adequately alleged direct, contributory and inducement of infringement. The Motions to Dismiss are denied.

### III. **MOTION TO DISQUALIFY**

### A. Legal Standard

Although this is a patent case, which is governed by the appellate law of the Federal Circuit, that Circuit defers to the particular regional circuit court regarding procedural matters, such as attorney disqualification. *Panduit Corp. v. All States Plastic Manufacturing Co., Inc.*, 744 F.2d 1564, 1575 (Fed. Cir. 1984).

Disqualification "is a drastic measure which courts should hesitate to impose except when absolutely necessary. A disqualification of counsel, while protecting the attorney-client relationship, also serves to destroy a relationship by depriving a party of representation of their own choosing." *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721-722 (7th Cir. 1982) (issue of appealability of disqualification later superseded by *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, (1985); *see also, In Re Firstmark Corp., Brouwer v. Ancel & Dunlap*, 46 F.3d 653, 659-660 (7th Cir. 1995)).

The parties also cite to the ABA Model Rules of Professional Conduct and seem to agree that they are substantially similar to both Illinois' rules (where Plaintiff is located) and Minnesota's rules (where Robins Kaplan and Best Buy are located). Best Buy does not dispute that Illinois state court precedent is applicable; merely that Illinois cases cited by Plaintiff are inapposite. Since the parties agree Illinois rules are applicable, and because questions of client confidences are judged from the perspective of the client (*Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319-1320 (7th Cir. 1978)), when it is necessary to refer to specific rules of conduct, the rules of the state of the purported client in this case (Illinois' rules) will be cited.

Two primary Illinois rules govern:  Rule 1.9 (Duties to Former Clients) and Rule 1.18 (Duties to Prospective Client).  Rule 1.9 provides:

> (a)  A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.
>
> (b)  A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
>
> (1) whose interests are materially adverse to that person; and
>
> (2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent.
>
> (c)  A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
> (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
>
> (2)  reveal  information  relating  to  the representation except as these Rules would permit or require with respect to a client.

Illinois  Rules  of  Professional  Conduct  of  2010,  available  at *http://www.state.il.us/court/supremecourt/rules/art_viii/default_ new.asp.*  Comment 2 to the rule notes:

> [A] lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that

type even though the subsequent representation involves a position adverse to the prior client.

Comment 3 notes:

Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter. … Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related. In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation.

Rule 1.18 provides:

(a) A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.

(b) Even when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation, except as Rule 1.9 would permit with respect to information of a former client.

(c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).

Comment 3 to the rule provides:

> Paragraph (b) prohibits the lawyer from using or revealing that information, except as permitted by Rule 1.9, even if the client or lawyer decides not to proceed with the representation. The duty exists regardless of how brief the initial conference may be.

Comment 6 provides:

> Even in the absence of an agreement, under paragraph (c), the lawyer is not prohibited from representing a client with interests adverse to those of the prospective client in the same or a substantially related matter unless the lawyer has received from the prospective client information that could be significantly harmful if used in the matter.

As to whether a substantial relationship exists between a client and an attorney, "a three-level inquiry [should] be undertaken. . . . First, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Third, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client." *LaSalle Nat'l Bank v. County of Lake*, 703 F.2d 252, 255-256 (7th Cir. 1983).

In general, "an attorney for a corporate client owes his duty [of loyalty] to the corporate entity rather than a particular officer, director or shareholder." *Bd. of Managers of Eleventh Street Loftominium Ass'n. v. Wabash Loftominium, LLC.*, 876 N.E.2d

- 12 -

65, 72 (Ill. App. Ct. 2007) (hereinafter, *Loftominium*). However, there may be circumstances where the lawyer must consider a subsidiary or other constituent of a corporate client to be a client as well, such as those instances where the subsidiary has the same management group. *Id.* at 72-73.

### B. Analysis

Without a doubt, the first question that must be answered is whether Cascades Branding has any former or prospective relationship with Robins Kaplan.

Cascades Branding says that *Loftominium* decrees it has both. Starting with TechSearch, the Court is confident that Robins Kaplan's relationship with this company imposes no former-client duties in relation to Cascades Branding. The Court finds that *Loftominium*'s extension of the client definition was limited to instances of subsidiaries or other closely-related entities (phrased as "other constituents" of the corporate entity).

Cascades Branding is in no way, shape or form a subsidiary, affiliate, parent or any other permutation of TechSearch. That Brown once ran and owned TechSearch, and now runs and owns Cascades Branding (through the parent company Cascades Ventures) stretches the understanding of *Loftominium* past the breaking point. As Best Buy points out, Brown sold TechSearch, and in doing so, he relinquished all claims to that company. Cascades' only link

(either parent or subsidiary) is common personnel (Brown), a link too tenuous to alone confer former client status.

Brown's claim to former client status in regards to TechSearch is further hampered by the comments to Illinois Rule 1.9 regarding the passage of time. Seven years passed between 2004 and the 2011 litigation of this case, a factor that also weighs against crediting the TechSearch relationship as a former client relationship. Further discrediting this argument is Brown's request (as Cascades Ventures owner) for a client-attorney agreement from Robins Kaplan during his 2010 discussions with that firm. It demonstrates that even Brown did not believe that relationship governed his current interactions with the firm, and that a new dynamic governed. In sum, the TechSearch/Cascades Branding connection is just too tenuous.

The question in relation to Brown and Cascades Ventures' interactions with Robins Kaplan in 2010 merits a closer look, however.

Just as in the TechSearch relationship, Cascades Branding was not the party engaging in the relationship with Robins Kaplan. But unlike TechSearch, Cascades Branding is a wholly-owned subsidiary of the party (Cascades Ventures) that had the relationship with Robins Kaplan. It is also clear that the parent company, Cascades Ventures, is directing the current litigation. *See GSI, infra.* Cascades Ventures and Plaintiff are managed by the same personnel,

are part of the same corporate family and are closely aligned in purpose.

It also appears that Cascades Ventures routinely operates its litigation through subsidiaries created for that purpose. In fact, the litigation which Brown sought to entice Robins Kaplan into filing was eventually filed through a subsidiary, Cascades Computer Innovation, LLC. Dkt. 70-1, 5, n.2.

*Loftominium* is not the only authority for the proposition that a parent, subsidiary or affiliate company can be a dual, if unsuspected, client. In *Discotrade, Ltd. V. Wyeth-Ayerst Int. Inc.*, 200 F.Supp.2d 355 (S.D.N.Y. 2002) (hereinafter *Discotrade*) plaintiff, a distributor, sued defendant, a supplier, alleging fraud and breach of contract. Wyeth moved to disqualify plaintiff's counsel on the grounds that Discotrade's counsel also represented a subsidiary of Wyeth's parent company in a patent application matter. The court found the corporate relationship between defendant and the parent company "so close as to deem them a single entity for conflict of interest purposes." *Id.* at 358-359. The closeness was based upon both companies being wholly-owned subsidiaries of the parent company, sharing the same board of directors and several senior officers, and using the same computer network, travel department, letterhead and health benefit plan. *Id.*

- 15 -

The Second Circuit approved of *Discotrade*, but cautioned that it agreed with "the ABA that affiliates should not be considered a single entity for conflicts purposes based solely on the fact that one entity is a wholly-owned subsidiary of the other, at least when the subsidiary is not otherwise operationally integrated with the parent company." *GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.,* 618 F.3d 204, 210-212 (2nd Cir. 2010) (disqualifying counsel for concurrent representation when the entities shared responsibility for both the provision and management of legal services). *GSI* noted that the focus on legal and management issues "reflects the view that neither management nor in-house legal counsel should, without their consent, have to place their trust in outside counsel in one matter while opposing the same counsel in another." *Id*. The notion even has a home in the Seventh Circuit. *See Westinghouse*, 580 F.2d at 1321 (protecting confidentiality interest of affiliate of client).

These cases dealt with concurrent representation, however, and the situation at hand deals with prospective representation, making it a further step removed. As Plaintiff points out, prospective representation, at least where confidential information has been shared, is viewed through the prism of Rule 1.9, governing former clients. But that one step of removal does not destroy the logic of parties reasonably expecting confidentiality in their past discussions with lawyers. As Charles W. Wolfram noted,

- 16 -

Here, too, courts have generously protected reasonable expectations in the confidentiality of information on the part of both the original corporate client and its then affiliates. As with concurrent-representation analogs, the few decisions dealing with the issue in the context of a corporate family have rooted a prohibition against the later representation on the grounds of confidentiality. Again in agreement with concurrent-representation analogs, the duty of the lawyer to avoid such conflicted representations applies whether the lawyer is likely to have learned the linking confidential information in the earlier representation from either the corporate client or from the non-client affiliate.

While the foregoing places important conflict limitations on the right of a lawyer to represent an adverse client, it is important to note that protection of confidentiality exhausts the duties of a lawyer to any former client, and certainly to a non-client to whom the lawyer owes confidentiality duties. In other words, no matter how adverse the later representation may be, if it is not also factually linked to the earlier representation in the way required under the substantial-relationship standard, the later representation is permissible.

*Legal Ethics: Corporate-Family Conflicts*, 2 J. Inst. Stud. Leg. Eth. 295, 355-356.

This Court, too, believes that the once-removed analysis does not destroy the expectation of confidentiality. Further, it is apparent that Cascades Ventures (the party that had the prospective-client relationship with Robins Kaplan) is effectively the same party as Cascades Branding for the purpose of conflict-of-interest analysis. This conclusion is based on the fact that Cascades Ventures is the sole owner of Cascades Branding, and due to the fact that Cascades Ventures appears responsible for acquiring and managing the legal representation of its

- 17 -

subsidiaries.  It is further based on the unique business model of Cascades Ventures, a non-practicing entity ("NPE") seeking to enforce patents through subsidiaries.

No one disputes that the litigation is directly adverse to Cascades Branding.  Therefore, under the above analysis, it is directly adverse to Cascades Ventures as well.

The disqualification question, therefore, turns on whether Cascades Ventures had a substantial relationship with Robins Kaplan.  Under the first prong of the Seventh Circuit's analysis, the Court must reconstruct the scope of the representation.  The parties do not dispute that the current litigation was not discussed.  The scope, instead, was Cascades Ventures' disclosure of confidential information in the course of exploring whether the law firm would represent it in the Elbrus patent portfolio matter.

The Court notes that the August 25, 2010 e-mail from attorney Schutz to Brown affirmatively demonstrates that confidential information was disclosed.  Dkt. 63-3, PageID 357.

The e-mail reflects ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

Another e-mail (the August 27, 2010 e-mail from Schutz to Brown, Dkt. 63-4, PageID 360) reflects that ████████████████████

███████████████████████████████████████████

██████████████████████████████████████████.

These two e-mails show knowledge of██████████████████

███████████████████████████████████████.

The August 25, 2010 communication reflects a distinct litigation strategy with regards to the Elbrus portfolio, and it further reflects that Schutz (e-mailing from an airport) was able to recall this information off the top of his head without the benefit of a file.

Robins Kaplan maintains that this e-mail reflects only strategy specific to one target of the Elbrus litigation, and does not reflect a wider knowledge of Cascades Ventures' "playbook" in regards to reasonable royalties in licensing, settlement thresholds, litigation strategy, Cascades Ventures' business model or other information that would be useful to a lawsuit opponent.

Plaintiff alleges that all of those broader matters were, in fact, communicated.

Robins Kaplan points to the eventual resultant Elbrus litigation (conducted by another firm), which did not necessarily follow the strategy outlined in the August 25, 2010 e-mail.

The e-mail does reflect an exchange on just one patent portfolio, but the Court notes that the second prong of the substantial relationship question does not call for who can prove what information was communicated. It asks merely whether "it is

reasonable to infer that the confidential information *allegedly* given would have been given to a lawyer representing a client in those matters." *See LaSalle, infra* (emphasis added).

The Court believes the e-mail at issue not only reflects strategy specific to one target in the Elbrus matter, but is illuminating as to Cascades Ventures' core litigation, licensing, reasonable royalty and business model strategies. Further, the e-mails reflect that Cascades Ventures and Schutz had other discussions not reflected in the submitted e-mails. It is reasonable to assume that, particularly in the unique context of an NPE, discussions would have necessarily touched on questions of what sort of return Cascades Ventures would accept, what sort of settlements would make litigation profitable, and what sort of royalty and licensing agreements Cascades was looking for. *See, generally, Intellectual Ventures, LLC v. Check Point Software Techs., LTD,* No. 10-1067-LPS (D.Del. April 6, 2011) (disqualifying law firm, which had formerly represented NPE in non-litigation matters, from representing defendants in litigation filed by that same NPE, despite the existence of internal screening methods). The second prong, therefore, is met.

As to the third prong, it must be determined if the information learned in that consultation is relevant to the current litigation. The Court finds that it is. NPE litigation is dollars-and-cents driven phenomenon, unburdened, usually, by the

emotional, bet-the-company patent litigation sometimes seen by practicing entities. Information on an NPE's thresholds for profit, licensing, royalty and litigation, therefore, give a much clearer picture to an opponent of where one might be attacked in litigation, and how an opponent will respond to those attacks.

Outside of the Seventh Circuit's three-prong analysis, the Illinois Rules call for the same result. Robins Kaplan has received information that could be significantly harmful to Cascades Ventures in this litigation, and Rule 1.18 mandates disqualification not only of Schutz, but the entire firm.

The Court is careful to note that it does not intend to impugn Schutz, McMahon or their firm in their conduct thus far revealed. It is simply a fact of life that knowledge, once gained, cannot be completely flushed out of someone's head. This is only further demonstrated by Schutz's ability to recall, without the benefit of any paperwork in front of him, detailed confidential information about the consultation with Brown. It would not be fair to either Cascades Ventures or Best Buy to ask him to operate without use of that knowledge, and in any case, Rule 1.18 does not allow for it.

The Court does not reach its conclusion lightly, and is cognizant that it deprives Best Buy of its long-term and preferred counsel in this matter. As Plaintiff notes, however, local counsel can continue to represent Best Buy, and this Court is prepared to entertain any and all motions for extended deadlines by Best Buy

that are premised on the need to retain new counsel and get them up to speed.

## IV.   CONCLUSION

Because Robins Kaplan learned confidential information in its prospective client negotiations with Plaintiff that would be harmful to Plaintiff in this litigation, Plaintiff's Motion to Disqualify Robins Kaplan as Best Buy's attorney is granted. Because Plaintiff has adequately alleged its causes of action against Best Buy and Target, the Motions to Dismiss are denied. **IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 5/3/2012